IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

LYNX FRANCHISING INTELLECTUAL
PROPERTY, LLC, a Delaware limited
liability company,

                Plaintiff and Counterclaim
                Defendant,

     v.

SUPERIOR FENCE AND
CONSTRUCTION, INC., an Oregon
corporation,

                Defendant and Counterclaim
                Plaintiff.

_____

Case No. 3:25-cv-00150-MC

OPINION AND ORDER

MCSHANE, Judge:

     Plaintiff Lynx Franchising Intellectual Property, LLC, brings this action against Defendant Superior Fence and Construction, Inc. Plaintiff alleges trademark infringement and unfair competition under federal statutes and common law. Compl., ECF No. 1. Defendant asserted various defenses and counterclaims in its Second Amended Answer. Second Am. Answer, ECF No. 15 ("Def.'s SAA"). Before the Court is Plaintiff's Motion to Dismiss Defendant's Counterclaim Four. Pl.'s Mot. Dismiss, ECF No. 17. Because Defendant cannot prevail as a matter of law on its "in commerce" theory, Plaintiff's Motion is GRANTED as to that theory. Plaintiff's Motion is DENIED as to the remaining well-pled theories.

## BACKGROUND[1]

Defendant, a fence installation company, was incorporated in Oregon on November 20, 1990, and has been doing business in Multnomah, Washington, and Clackamas Counties in Oregon since its incorporation. Def.'s SAA (Counterclaims) ¶¶ 1–2. Besides Oregon, Defendant has done business in Clark County, Washington, since 1992. *Id.* at ¶ 2. Defendant has continuously offered and provided fence installation services outside the Portland metro area, but not outside of Oregon or Washington. *Id.* at ¶ 3. Since inception, Defendant has done business as "Superior Fence & Construction" and "Superior Fence," and has used these labels in its advertising and product labeling continuously. *Id.* at ¶¶ 4, 7–10. Before March 31, 2010, Defendant held state trademark rights for its Superior Fence Trademarks in the Portland metro area, Oregon, and Washington. *Id.* at ¶ 12. Defendant has maintained a website since 1996, where Defendant has continuously displayed its Superior Fence trademarks. *Id.* at ¶ 6.

Plaintiff owns U.S. Trademark registration nos. 3873318 ("Superior Fence & Rail, Inc.") and 7252466 ("Superior Fence & Rail"). *Id.* at ¶¶ 16, 29. The former was registered on November 9, 2010, to a now-dissolved company, Superior Fence & Rail, Inc. ("SFR"). *Id.* at ¶¶ 17, 22. SFR was formed in Florida in 2002 and applied to register its mark on March 31, 2010. *Id.* at ¶ 16. At the time of application, SFR had only ever installed fences in Florida; had only ever held itself out as available to do business in Florida; and had only eight offices, all exclusively in Florida. *Id.* at ¶¶ 17–19.

Plaintiff was incorporated in Delware on August 31, 2021. *Id.* at ¶ 14. An assignment recorded with the U.S. Trademark Office shows that Plaintiff was assigned the rights to registration no. 3873318 ("Superior Fence & Rail, Inc.") for "installation of fences." *Id.* at ¶ 16. One of the

---

[1] At the motion to dismiss stage, this Court takes all of Defendant's allegations as true. *See Burget v. Lokelani Bernice Pauahi Bishop Trust*, 200 F.3d 661, 663 (9th Cir. 2000).

assignors was SFR. *Id.* Plaintiff applied to register trademark no. 7252466 ("Superior Fence & Rail") on September 26, 2022, and the trademark was officially registered on December 26, 2023. *Id.* at ¶¶ 12, 29.

McGraw Enterprises LLC ("McGraw") was incorporated in Oregon on February 14, 2023, and is a franchisee or licensee of Plaintiff. *Id.* at ¶¶ 23, 41. In July 2023, McGraw registered its assumed business name, "Superior Fence and Rail of Portland Metro," in Clackamas, Multnomah, and Washington counties. *Id.* at ¶ 24. That same month, McGraw became licensed to do business in Oregon. *Id.* McGraw has been advertising in the Portland Metro area (including Clackamas, Multnomah, Washington, and Clark counties) on its website, https://www.superiorfenceandrail.com/portland-metro/. *Id.* at ¶ 25. McGraw or Plaintiff paid to have this website promoted, so that when users in the Portland Metro area search the internet for "Superior Fence," McGraw's website appears as a sponsored advertisement. *Id.* at ¶¶ 26–27. McGraw's use of "Superior Fence" in its business name and advertising has caused confusion for customers in the Portland Metro area, in that they contacted McGraw when they thought they were contacting Defendant. *Id.* at ¶ 28.

On September 25, 2024, Defendant sued McGraw in Clackamas County Circuit Court, Oregon, seeking to enjoin McGraw from doing business as "Superior Fence and Rail of Portland," and from using the words "Superior Fence" in its advertising. *Id.* at ¶ 60. Defendant served that complaint on McGraw on October 7, 2024. *Id.* On October 14, 2024, Plaintiff, through its General Counsel, filed a Declaration of Use and Incontestability Affidavit in which they stated that "there is no proceeding involving said rights [including the right of ownership over a mark] pending . . . in a court." *Id.* Plaintiff's counsel in this action also represents McGraw in state court. *Id.*

**LEGAL STANDARD**

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Under *Twombly*, courts assess a plaintiff's claims from a two-step approach. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). First, the Court must strike out any legal conclusions, including "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* Second, the Court must determine whether the remaining factual allegations state a plausible claim for relief. *Id.* This is a context-specific task, requiring the Court "to draw on its judicial experience and common sense." *Id.* at 679. To establish plausibility, the well-pleaded facts must allow for "the court to infer more than the mere possibility of misconduct"—they must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678–79. Additionally, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 557). Finally, besides demanding plausibility, the pleading standards also require the plaintiff to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

Allegations of fraud must comply with both Federal Rules of Civil Procedure 8(a) and 9(b). *Cafasso v. Gen. Dynamics C4 Sys.*, 637 F.3d 1047, 1055 (9th Cir. 2011). In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Fed. R. Civ. P. 9(b). To satisfy the particularity requirement, a plaintiff must identify the "who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." *Cafasso*, 637 F.3d at 1055 (internal quotation marks and citations omitted).

## DISCUSSION

### I. Defendant's Fourth Counterclaim Seeks to Cancel Plaintiff's Registered Marks

Defendant seeks to cancel trademark registration nos. 3873318 and 7252466, arguing that Plaintiff or its predecessor-in-interest obtained them fraudulently.[2] Def.'s SAA (Counterclaims) ¶¶ 58–61, 63. Defendant alleges three theories of fraud: (1) fraudulent certification of the Lanham Act's "in commerce" requirement, (2) fraudulent certification of ownership of the mark/entitlement to use the mark, and (3) fraudulent certification that the rights to the mark were not involved in a court proceeding. *See id.* Defendant alleges that the first two false representations were made in an application for trademark registration, whereas the last was made in a § 15 declaration of use and incontestability affidavit ("§ 15 affidavit"). *Id.*

#### A. Standard for cancellation of a fraudulently obtained mark registration

Section 14 of the Lanham Act allows for the cancellation of a mark's registration if it was "obtained fraudulently." 15 U.S.C. § 1064. To meet this standard, Defendants must show "(1) a false representation regarding a material fact; (2) the registrant's knowledge or belief that the representation is false; (3) the registrant's intent to induce reliance upon the misrepresentation; (4) actual, reasonable reliance on the misrepresentation; and (5) damages proximately caused by that reliance." *Hokto Kinoko Co. v. Concord Farms, Inc.*, 738 F.3d 1085, 1097 (9th Cir. 2013) (citing *Robi v. Five Platters, Inc.*, 918 F.2d 1439, 1444 (9th Cir. 1990)). Assuming that all five elements are met, a registration may be cancelled when the misrepresentation is in the original application. *Id.* (citing J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 20:58 (5th ed. 2019)). The Court discusses below whether a fraudulent § 15 affidavit serves as a

---

[2] Defendant also argues that the registrations should be cancelled on non-fraudulent grounds, which Plaintiff does not address in either its Motion or Reply. *See* Def.'s SAA (Counterclaims) ¶ 62; *see generally* Pl.'s Mot.; Pl.'s Reply, ECF No. 23. Accordingly, the Court solely addresses Defendant's theories of fraud.

ground for cancellation of a mark's registration.

Because no dispute between the parties exists as to the fourth and fifth elements, the Court need not address those elements. Nor does the Court need to address the third element. The third element is established if "intent to deceive the [Patent and Trademark Office is] 'the single most reasonable inference able to be drawn.'" *See In re Rosuvastatin Calcium Pat. Litig.*, 703 F.3d 511, 519 (Fed Cir. 2012) (quoting *Therasense, Inc. v. Becton, Dickinson and Co.*, 649 F.3d 1276, 1287 (Fed. Cir. 2011) (en banc)). The Court may infer intent to deceive from indirect and circumstantial evidence. *Therasense, Inc.*, 649 F.3d at 1290 (citing *Larson Mfg. Co. of S.D., Inc. v. Aluminart Prods. Ltd.*, 559 F.3d 1317, 1340 (Fed. Cir. 2009)). If the allegations establish that a known, false representation of material fact was deliberately submitted to the Trademark Office, then the Court may infer intent to deceive—that is, if the first two elements are well-pled, the third is as well. *See Torres v. Cantine Torresella S.r.l.*, 808 F.2d 46, 49 (Fed. Cir. 1986) (Supporting the proposition that a registrant "has knowingly attempted to mislead the [Patent and Trademark Office]" when the registrant knowingly submitted a false statement of material fact); *cf. Therasense, Inc.*, 649 F.3d at 1290 (emphasis in original) (quoting *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1181 (Fed. Cir. 1995)) (To show intent to deceive "[i]n a case involving nondisclosure of information, clear and convincing evidence must show that the applicant *made a deliberate decision* to withhold a *known* material reference"). An inference of deceptive intent can be rebutted by showing that the misrepresentation was borne from an honest mistake or inadvertence. *See In re Bose Corp.*, 580 F.3d 1240, 1246 (Fed. Cir. 2009) ("There is no fraud if a false misrepresentation is occasioned by an honest misunderstanding or inadvertence without a willful intent to deceive"). That is not argued here. Accordingly, the Court need only address whether the first two elements are well-pled; if so, the third element is too.

In sum, the Court's inquiry is to determine whether Defendant's allegations establish the plausibility (and particularity) of there having been (1) a false representation of material fact submitted to the Trademark Office, which was (2) known to be false by the applicant. *See Hokto Kinoko Co.*, 738 F.3d at 1097. The Court addresses each of Defendant's theories in turn.

## II. Fraudulent Certification of the Lanham Act's "in commerce" Requirement

Defendant argues that registration no. 3873318 should be cancelled because SFR, knowing that its mark was not being used "in commerce" as defined by the Lanham Act, told the Trademark Office in 2010 that the mark was being used "in commerce." Def.'s SAA (Counterclaims) ¶ 58. The Court disagrees. Defendant cannot prevail in its argument as a matter of law because SFR was using the mark "in commerce."

### A. The Lanham Act's "in commerce" requirement

An applicant seeking to register their mark with the Trademark Office must certify that the mark has been used "in commerce." 15 U.S.C. § 1051(a); 37 C.F.R. § 2.34(a)(1). Under the Lanham Act, a mark associated with services is "use[d] in commerce . . . when it is used or displayed in the sale or advertising of services *and the services are rendered in commerce . . . .*" 15 U.S.C. § 1127 (emphasis added). The Lanham Act further defines "commerce" as "all commerce which may lawfully be regulated by Congress." *Id.* There is no dispute that SFR used its mark in the sale or advertising of fence-installation services; the first question then is whether SFR's services were "rendered in commerce"—i.e., whether SFR's services could have been regulated by Congress.

The Constitution authorizes Congress "[t]o regulate Commerce . . . among the several States." U.S. Const. art. 1, § 8, cl. 3. Under this authority, Congress may regulate "those activities that substantially affect interstate commerce." *United States v. Lopez*, 514 U.S. 549, 559 (1995).

An individual entity's activity substantially affects interstate commerce if the activity *in aggregate* would substantially affect interstate commerce. *Taylor v. United States*, 579 U.S. 301, 306 (2016) (citing *Wickard v. Filburn*, 317 U.S. 111, 125 (1942)). It is of no consequence then that the entity's individual effect on interstate commerce is slight—the entity may be regulated so long as the activity in aggregate would substantially affect commerce. *Id.* Congress's authority under this prong is famously far-reaching, as illustrated below; the only recognized limitation on this power is that the activity be "economic in nature." *See United States v. Morrison*, 529, U.S. 598, 601–02, 613 (2000) (holding that the Commerce Clause could not support a law providing a civil remedy for victims of gender-motivated violence because "[g]ender-motivated crimes of violence are not, in any sense of the phrase, economic activity"). Here, there is no dispute that fence installation services are an economic activity; the only remaining question is whether SFR's intrastate fence installation services would have, in aggregate, substantially affected interstate commerce.

Intrastate economic activities have frequently been lawfully regulated by Congress,[3] and the extent of Congress's reach is best illustrated in *Wickard v. Filburn*, 317 U.S. 111 (1942). Filburn owned and operated a small farm where he maintained a herd of cattle and raised poultry. *Id.* at 114. He also grew wheat; a portion of which was for direct economic gain (both sold directly and used to feed animals which he sold), and the remainder was for domestic uses (both to make flour for home consumption and to seed next year's wheat). *Id.* The Secretary of Agriculture assessed a penalty against Filburn because Filburn had grown about 12 acres more than he was allotted under the Agricultural Adjustment Act of 1938—an act designed to regulate the volume of wheat moving in interstate commerce and to stabilize its price. *Id.* at 114–15. The Court— operating under the assumption that Filburn was using his wheat *solely* for domestic purposes—

---

[3] *Lopez*, 514 U.S. at 559–560 (listing examples Congress's lawful regulation of intrastate economic activities).

upheld the validity of the Act as to Filburn: "That [Filburn]'s own contribution to the demand for wheat may be trivial by itself is not enough to remove him from the scope of federal regulation where, as here, his contribution, taken together with that of many others similarly situated, is far from trivial." *Id.* at 127–28. The Court thereby held in effect that Congress could regulate how much wheat an individual farmer could grow, even if the wheat was used exclusively for domestic purposes and never left the farm it was grown on. *See id.* Such is the reach of Congress's authority under the Commerce Clause.

### B. SFR's mark was "in commerce"

Just as Congress may regulate a single farm's wheat production, it may regulate a single company's intrastate fence installation services. According to Defendant's pleadings, in 2010, SFR was a fence installation company that did business solely within Florida. Def.'s SAA (Counterclaims) ¶¶ 17–19. Despite Defendant's contentions, this by itself is enough to establish that Congress could regulate SFR, because SFR's fence installation services, in aggregate, would have substantially affected interstate commerce.

In *Wickard*, Congress sought to stabilize the supply and price of wheat within the nation by allocating the amount of wheat each farmer could produce. 317 U.S. at 115. Similarly, if Congress was so compelled, it could control the supply and price of fencing materials (e.g., iron, steel, plastics, or wood) by controlling the amount of fencing allowed to be installed by fence installation companies. If Congress was to have implemented such restrictions in 2010, SFR would have been subject to those regulations because SFR's fence installation services, "taken together with that of many others similarly situated"—i.e., other intrastate fence installation companies— would be "far from trivial." *Id.* at 128; *cf. id.* at 128–29 ("Home-grown wheat . . . competes with wheat in commerce. . . . wheat consumed on the farm where grown if wholly outside the scheme

of regulation would have a substantial effect in defeating and obstructing [the Act's] purpose"). [4]

Because Congress could regulate intrastate fence installation services in 2010, SFR's fence installation services were, as a matter of law, rendered "in commerce." SFR did not lie to the Trademark Office in 2010 when it claimed that its mark was being used in commerce.

### III. Fraudulent Certification of Ownership of the Mark/Entitlement to Use the Mark

Defendant also alleges that SFR obtained mark no. 3873318 fraudulently in 2010 when it told the Trademark Office that it was entitled to use the mark, when in fact SFR was aware of other competitors with senior rights to "Superior Fence[.]"[5] Def.'s SAA (Counterclaims) ¶ 59. Defendant points to itself and another company, "Superior Fence" (incorporated in Idaho in 1996), observing that both companies have maintained websites since 1996 and 2007 under domain names of "www.superiorfence.com" and "www.superiorfences.com," respectively. *Id.* Defendant alleges that SFR became aware of these trade names first in 2005 when SFR was in the process of selecting its website domain name, and again in 2009, when SFR investigated the value of its brand and trademark (as part of the process for selling part of the company to an investor). *Id.* Despite SFR's knowledge of other companies having used "Superior Fence" for longer than itself, Defendant continues, SFR's authorized signatory declared in the 2010 registration application that "he/she believes [SFR] to be entitled to use such mark in commerce; to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce . . . ." *Id.* at ¶¶ 54–55. Defendant's theory is well-pled.

---

[4] Having found one way Congress could lawfully regulate SFR, the Court need not explore, as an alternative ground for lawful regulation, the relationship between fencing and goods moving through interstate commerce.

[5] Defendant also alleges that Plaintiff fraudulently obtained mark no. 7252466 because Plaintiff was aware of competitors with superior rights to "Superior Fence" yet told the Trademark Office that Plaintiff was the owner of the mark. Def.'s SAA (Counterclaims) ¶ 63. Much like Defendant's non-fraud theories, Plaintiff does not address this theory of cancellation; the Court need not address it either.

### A. Standard for fraudulent certification of ownership of a mark/entitlement to use a mark

A trademark applicant engages in fraud if they (1) declare in the application that no other person has the right to use the mark, but (2) knew of the existence of a confusingly similar (or identical) mark, and (3) believed that the other mark was superior-in-right to applicant's mark. *See Quiksilver, Inc. v. Kymsta Corp.*, 466 F.3d 749, 755 (9th Cir. 2006); *see also Hokto Kinoko Co.*, 738 F.3d at 1097; J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION §§ 31:71, 31:75 (5th ed. 2025). The parties concede (or rather, do not argue to the contrary) that the various trademarks at issue are confusingly similar.

### B. In light favorable to Defendant, SFR fraudulently certified that it was the owner of a mark/entitled to use a mark

Defendant has pled the first element because it alleged that SFR, via an authorized signatory, certified that no other person or entity had the right to use the mark at issue. Def.'s SAA (Counterclaims) ¶ 55. The second element has been pled with particularity as well: Defendant points to two different companies that used "Superior Fence" in their trade and domain names, and two specific instances of when SFR discovered them. First, during the process of selecting a website domain name, and second, during SFR's investigation into the value of its brand and trademark. *Id.* at ¶ 59. Both of these instances were before SFR's 2010 application. *See id.* For the third element, Defendant has shown that the other marks were plausibly superior-in-right: SFR was not formed until 2002, whereas Defendant and "Superior Fence" (of Idaho) had been in business since the 90s, which would make SFR's claim to the mark inferior. *Id.* at ¶¶ 2, 59; *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1047 (9th Cir. 1999) (citations omitted) ("a fundamental tenet of trademark law is that ownership of an

inherently distinctive mark . . . is governed by priority of use. . . . The first to use a mark is deemed the 'senior' user and has the right to enjoin 'junior' users"). SFR plausibly knew that the other companies had senior rights, since dates of use are crucial to a company's investigation into the value of its brand and trademark—and Defendant alleges that SFR undertook such an investigation. Def.'s SAA (Counterclaims) at ¶ 59; *see Brookfield Communications, Inc.*, 174 F.3d at 1047; J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 16:1 (5th ed. 2025) ("Priority of use is a critical issue in many trademark disputes. The party who can prove it was first to use becomes the owner of a valuable trademark right").

Having pled this theory of fraud with particularity, Plaintiff has thereby pled the first two elements of the *Hokto Kinoko Co.* analysis—"(1) a false representation regarding a material fact [and] (2) the registrant's knowledge or belief that the representation is false." *See Hokto Kinoko Co.*, 738 F.3d at 1097. As discussed above, the Court need only address these two elements; this theory of fraud survives Plaintiff's Motion to Dismiss.

## IV. Fraudulent § 15 Declaration of Use and Incontestability Affidavit

Defendant argues that Plaintiff's mark no. 3873318 should be cancelled because Plaintiff submitted a fraudulent § 15 affidavit to the Trademark Office, wherein Plaintiff represented that there was no court proceeding involving its rights to the mark, when in fact Plaintiff knew the mark was involved in a proceeding in state court. Def.'s SAA (Counterclaims) ¶ 60; Def.'s Resp. 4–5, ECF No. 22. Defendant's theory is well-pled.

Defendant's theory rests upon the following allegations: On September 25, 2024, Defendant filed suit against McGraw, a licensee/franchisee of Plaintiff, in Clackamas County Circuit Court, Oregon. Def.'s SAA (Counterclaims) ¶ 60. Defendant sought to enjoin McGraw from using "Superior Fence" in its marketing materials and business name within Multnomah,

Clackamas, and Washington counties. *Id.* The complaint for that case was served on McGraw on October 7, 2024. *Id.* Even though a declaration of use and incontestability could have been filed anytime after 2015, Plaintiff's general counsel filed a declaration of use and incontestability with the Trademark Office exactly one week later, on October 14, 2024. *Id.*; Def.'s Resp. 5; *see* 15 U.S.C. § 1065(3). In its § 15 affidavit, Plaintiff represented that "there is no proceeding involving said rights [referring to rights associated with the mark] pending . . . in a court[.]" Def.'s SAA (Counterclaims) ¶ 60. In state court, McGraw's defense counsel—who also represent Plaintiff in this action—relied on Trademark Office records of Plaintiff's registered marks, and a license between Plaintiff and McGraw allowing McGraw to use those marks. *Id.* Pointing toward these factual allegations, Defendant theorizes that Plaintiff filed its § 15 affidavit knowing that its right to use the mark was involved in the state court proceeding. *Id.*

### A. Standard for a fraudulent § 15 affidavit

A declaration of use and incontestability can only be approved by the Trademark Office if, amongst other things, "there is no proceeding involving said rights [including the right to ownership of a mark] pending in . . . a court and not finally disposed of." 15 U.S.C. 1065(2). The first two elements of the *Hokto Kinoko Co.* analysis are satisfied in this context when an applicant (1) submits to the Trademark Office a declaration of use and incontestability, affirming that there was no proceeding involving their rights to the mark, but (2) the applicant knew that their rights to the mark were involved in a proceeding. *See Hokto Kinoko Co.*, 738 F.3d at 1097; *see also Robi*, 918 F.2d at 1444. Although this would seem to be a fairly straightforward test, there is limited guidance on what constitutes a "proceeding involving said rights."

### i. Standard for a "proceeding involving said rights"

The Ninth Circuit has not defined what constitutes a "proceeding involving said rights,"

and courts analyze this issue in a variety of ways. Some courts defer to the Trademark Manual of

Examining Procedure, which states that "[t]he USPTO does not consider a proceeding involving

the mark in which the owner is the plaintiff, where there is no counterclaim involving the owner's

rights in the mark, to be a 'proceeding involving these rights.'" TMEP § 1605.04.[6] However, this

Court is more persuaded by *Penn. State. Univ. v. Vintage Brand, LLC*, which rejected the USPTO's

interpretation and analyzed the plain language of 15 U.S.C. § 1065(2) to arrive at a less rigid

definition. 755 F.Supp.3d 563, 581 (M.D. Pa. 2024). The court—discussing whether an affirmative

defense brought by the defendant against the trademark-holding plaintiff constituted a "proceding

involving said rights"—reasoned as follows:

> But [the determination that an affirmative defense does not qualify
> as a relevant proceeding], not to mention the USPTO's
> interpretation, does not align with a plain reading of 15 U.S.C. §
> 1065(2), which references broadly a "proceeding involving said
> rights" pending in any court that has not been "finally disposed of."
> An affirmative defense challenging the validity of a trademark
> certainly involves a party's rights in that trademark, **and a
> successful affirmative defense here could mean that plaintiff's
> trademarks bearing the [] design are invalid, or at least that
> defendant's use of those marks is not infringing.** As the USPTO
> has repeatedly stated, to "the extent that a civil action in a Federal
> district court involves issues in common with those in a proceeding
> before the USPTO, the decision of the Federal district court is
> binding upon the USPTO, meaning a finding in defendant's favor
> would have a preclusive effect before the USPTO.
>
> In *British Broadcasting Corporation v. Scott Stander & Associates,
> Inc.*, 2017 WL 11682913, at *6 (C.D. Cal. Mar. 17, 2017), the
> United States District Court for the Central District of California
> assessed whether a mark was incontestable when there was, at the
> time the application for incontestable status was filed, a pending
> "affirmative defense that asserted plaintiffs are not the rightful
> owners of any trademarks or rights to trademarks." That court
> determined that, regardless of the fact that the challenge was brought
> in an affirmative defense, the defendants had "challenged plaintiffs'

---

[6] For cases applying the USPTO's standard, see *Levi Strauss Co. v. Esprit US Distribution Ltd.*, 588 F.Supp.2d 1076, 1083 (N.D. Cal. 2008); *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, 548 F.Supp.2d 811, 814 (N.D. Cal. 2008); *Sunrise Jewelry Mfg. Corp. v. Fred S.A.*, 175 F.3d 1322, 1327 (Fed. Cir. 1999).

ownership and rights to the word mark in a pending proceeding," meaning the relevant trademark had not achieved incontestable status. *Id.*

And in *Holley Performance Products, Inc. v. Quick Fuel Technology, Inc.*, 624 F.Supp.2d 610, 615–16 (W.D. Ky. 2008), the United States District Court for the Western District of Kentucky rejected a literal interpretation of the USPTO's language holding that a proceeding in court does not qualify under § 1065(2) unless there is a counterclaim involved. Instead that court registered its doubt that the USPTO's "use of the term 'counterclaim' is meant to privilege form over substance" and noted that another court had construed an affirmative defense as a counterclaim under the USPTO's definition. *Id.* at 616.

These decisions follow a more natural reading of the plain language of § 1065(2) and are in accord with what would appear to be the basic reason for having that rule: to prevent conflicting decisions from courts and the USPTO, particularly since any court decision would be binding on the USPTO. Consequently, the Court concludes that an affirmative defense is sufficient to preclude incontestability while that affirmative defense remains unsolved.

*Id.* at 581–82 (emphasis added) (citation modified) (footnotes omitted).

Accordingly, to determine whether a mark is involved in a proceeding, this Court will consider the extent to which the applicant's rights to the mark could be adversely affected by the proceeding. *See id.* at 581. Here, if the state proceeding could render Plaintiff's mark invalid or result in a finding that Defendant's use of the mark is not infringing, then Plaintiff's mark was involved in a proceeding under § 1065(2).[7] *See id.*

---

[7] At oral argument, Plaintiff argued that rights to a mark are not involved in a proceeding under § 1065(2) where, such as here, the proceeding could have only affected the *scope* of the registrant's rights to the mark. That is, where a proceeding could only affect the registrant's rights to a mark *within a confined geographic area*, then that mark is not involved in a proceeding. Plaintiff's argument is unconvincing. Dispositively, § 1065 makes no distinction between proceedings concerning whole ownership of the mark and proceedings concerning only the scope of ownership. *See* § 1065. Rather, § 1065 discusses "the right of the owner to use such registered mark in commerce" and references broadly a "proceeding involving said rights[.]" *Id.* Therefore, the threshold for when a mark is involved in a proceeding is not tethered to the scope of the right involved; a mark is involved in a proceeding if the proceeding could affect the right to use the mark in commerce. *See id.*

**B. Application**

i. Plaintiff made a false representation of material fact

Based on Defendant's allegations, Plaintiff's mark was involved in a proceeding starting on September 25, when Defendant filed a state action against McGraw, seeking to enjoin McGraw from using "Superior Fence." The mark was involved in a proceeding under § 1065(2) because Plaintiff's interest in the mark would have been adversely affected if Defendant was to prevail in the state action: Plaintiff's licensee (McGraw) would be enjoined from doing business under Plaintiff's registered mark within the Portland area. *Cf. Penn. State Univ.*, 755 F.Supp.3d at 582 (holding that defendant's affirmative defense "qualifies as a proceeding under § 1065" because it "is adverse to [Plaintiff]'s claim of ownership of [its] mark"); *Gutier v. Hugo Boss Trade Mark Management GmbH & Co. KG*, 555 Fed. App'x 947, 949 (Fed. Cir. 2014) (holding that a trademark infringement suit constitutes a proceeding involving said rights). And that McGraw in its defense relied upon Trademark Office records of Plaintiff's mark only further evinces that the mark was involved in the state action. The Court concludes that Defendant's action to enjoin McGraw from using the "Superior Fence" portion of Plaintiff's mark renderered the mark ineligible for incontestability status under § 1065(2). [8]

Because Plaintiff's mark was involved in a proceeding when Plaintiff filed a § 15 affidavit, Plaintiff made a false representation of material fact by asserting that there was no "proceeding involving said rights." Def.'s SAA (Counterclaims) ¶ 60. This leaves only the question of whether Plaintiff intended to deceive the Trademark Office.

---

[8] It is of no moment that Plaintiff was not a named party in that action. Plaintiff's mark was involved because McGraw's use of "Superior Fence" derives from Plaintiff's registered mark, "Superior Fence and Rail, Inc." Contrary to Plaintiff's assertion, there is no requirement in § 1065(2) that the owner of the mark be a party to the action involving the mark. *See* 15 U.S.C. § 1065(2).

<u>ii. Plaintiff plausibly knew its representation was false</u>

The Court, looking toward Defendant's allegations, finds that there are sufficient circumstances from which to infer Plaintiff's intent to deceive the Trademark Office, and that the misrepresentation was not borne from a mistake. *See In re Bose Corp.*, 580 F.3d at 1245 (quoting *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008) ("[B]ecause direct evidence of deceptive intent is rarely available, such intent can be inferred from indirect and circumstantial evidence. But such evidence must still be clear and convincing, and inferences drawn from lesser evidence cannot satisfy the deceptive intent requirement").

The alleged circumstances allow the Court to infer that knowledge of the mark's involvement in a proceeding reached Plaintiff before it filed its § 15 affidavit. First, McGraw plausibly knew that the mark was implicated in the state proceeding: Defendant sought to enjoin McGraw from using "Superior Fence" in its name and marketing; McGraw's use of "Superior Fence" derives from its use of "Superior Fence and Rail"; and McGraw's entitlement to use "Superior Fence and Rail" stems from its licensee/licensor relationship with Plaintiff, and Plaintiff's rights to the mark. Second, this knowledge from McGraw plausibly travelled from McGraw to Plaintiff, either through McGraw's counsel (who represent Plaintiff in this action), or from McGraw to Plaintiff directly. Lastly, the timing is very suspicious: Even though Plaintiff could have filed a declaration of use and incontestability *at any time* after 2015, it decided to do so on October 14, 2024, *one week* after the state-action complaint was served on McGraw.

Urging this Court to hold otherwise, Plaintiff argues that it was genuinely unaware that its rights to the mark were involved in a proceeding when it filed the § 15 declaration. Pl.'s Reply 5, ECF No. 23. To show that Plaintiff lacked knowledge of its mark being involved in a proceeding, Plaintiff points toward Defendant's briefing in the state action, wherein Defendant stated that

"[t]he proposed Amended Complaint does not attack Lynx or any federal trademark registration." Pl.'s Reply, Doc. 23-1, at 4. Plaintiff's contention is unconvincing because: (1) As discussed above, the Court finds that Defendant's state action *did* implicate Plaintiff's registered mark, regardless of whether Defendant's briefing says otherwise; (2) The Court's inquiry is whether Defendant's October 7 Complaint would have signalled to Plaintiff that its mark was involved, but Defendant's statement here refers to an *Amended* Complaint in that action, and does not comment on the contents of the original Complaint; and (3) Plaintiff conveniently omits Defendant's acknowledgement, in the very next sentence of the same brief, which states that McGraw relied upon Plaintiff's trademark registration for its affirmative defenses—further supporting the inference that Plaintiff's trademark was involved in the proceeding. *Id.* ("Rather, [McGraw] alleged a 2010 federal trademark registration . . . in its . . . Affirmative Defenses as the basis for [McGraw]'s purported trademark rights").

Because Defendant's theory is well-pled, the Court next resolves a dispute between the parties as to whether a fraudulent § 15 affidavit serves as a ground for canceling the trademark's registration, or merely its incontestability status.

### C. Cancellation of a mark's registration is a remedy for a fraudulent § 15 affidavit

The parties disagree over what law controls here. Defendant points to a Ninth Circuit case, *Robi v. Five Platters, Inc.*, for the proposition that "filing a fraudulent incontestability affidavit provides a basis for canceling the registration itself[.]" 918 F.2d at 1444. In contrast, Plaintiff points to a Federal Circuit case, *Great Concepts, LLC v. Chutter, Inc.*, which held that a fraudulent § 15 affidavit is a ground for cancellation of the mark's *incontestability status*, not its registration. 90 F.4th 1333, 1339, 1343 (Fed. Cir. 2024). Although this issue is ripe for revisiting by the Ninth Circuit, this Court is still bound by *Robi*.

Plaintiff argues that this Court is not bound by *Robi* under *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003). Under *Miller*, a district court is bound to follow the reasoning of a precedential case "unless it had been 'effectively overrule[d]' or was 'clearly irreconcilable' with a case from the relevant court of last resort" *United States v. Gonzalez-Zotelo*, 556 F.3d 736, 740–41 (9th Cir. 2009) (alteration in original) (quoting *Miller*, 335 F.3d at 899–900). Plaintiff observes that *Robi* relied upon old Federal Circuit cases for its holding—cases that were abrogated by *Great Concepts, LLC*. *Compare Robi*, 918 F.2d at 1444 (holding and cases relied upon) *with Great Concepts, LLC*, 90 F.4th at 1341–1343 (expressly abrogating the cases relied upon in *Robi* and discussing why *Robi* was unpersuasive). However, this Court need not address whether *Robi*'s reasoning was undercut by *Great Concepts, LLC*, because the court in *Great Concepts, LLC* is not a "court of last resort[.]" *See Cardinal Chemical Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 97 (1993) ("the Federal Circuit is not a court of last resort"). As such, this Court is bound by *Robi*, which provides that a fraudulent § 15 affidavit is a ground for cancellation of the mark's registration. *Robi*, 918 F.2d at 1444.

## **CONCLUSION**

Plaintiff's Motion to Dismiss, ECF No. 17, is GRANTED as to Defendant's "in commerce" theory. Because Defendant cannot prevail on its "in commerce" theory as a matter of law, that theory is DISMISSED with prejudice. Plaintiff's Motion is DENIED as to Defendant's remaining theories.

IT IS SO ORDERED.

DATED this 25th day of November 2025.

_____s/Michael J. McShane_____
Michael McShane
United States District Judge